PEOPLE v KACHAR

Docket No. 55432. Argued October 8, 1975 (Calendar No. 1).—Decided
    May 2, 1977.

Emil Kachar was convicted by a jury in Monroe Circuit Court,
    James J. Kelley, J., of receiving stolen property. The issue at
    trial was the identification of the defendant as the recipient of
    the stolen merchandise. After defendant was bound over for
    trial a witness, at a pretrial photographic identification
    conducted by police in the absence of defense counsel, selected
    3 photographs of the defendant from a group of 30 photo-
    graphs, all of which were labelled with the subjects' names.
    The witness testified at trial that he had never seen the
    defendant before the transfer of the stolen property, and de-
    scribed the man who received it by his physical characteristics
    other than his face. The Court of Appeals, Fitzgerald, P. J., and
    Gillis and Adams, JJ., affirmed in a per curiam opinion, finding
    that the in-court identification of the defendant had an inde-
    pendent basis and was not tainted by the defective photo-
    graphic showup (Docket No. 14762). Defendant appeals. In an
    opinion by Justice Williams, Justice Levin concurring and
    Chief Justice Kavanagh concurring in the result, it was held:

1. Defense counsel must be present at a photographic identifi-
    cation of an accused who is in custody, or who is the focus of
    investigation. In the instant case the defendant had already
    been bound over for trial when the witness came forward. The
    defendant's counsel should have been present at the showup,
    and under the circumstances of this case, a photographic
    showup should not have been held at all.

2. Convictions based on eyewitness identification at trial
    following a pretrial identification by photograph will be set
    aside if the photographic procedure was so impermissibly sug-
    gestive as to give rise to a very substantial likelihood of
    irreparable misidentification. The eyewitness testified that at
    the time of the transaction a friend had pointed out the man

REFERENCES FOR POINTS IN HEADNOTES

[1–11] 21 Am Jur 2d, Criminal Law §§ 368, 369.
    Admissibility of evidence of photographic identification as affected
    by allegedly suggestive identification procedure. 39 ALR3d 1000.

purchasing the guns and said his name was "Kachar". The photographs he was shown by police were all labelled with names and were apparently photographs of faces, while he testified that he remembered the purchaser's body build. Under the circumstances of the case the use of labelled photographs may have caused him to recognize the defendant's name rather than his face. Unless there is a showing by clear and convincing evidence that the witness's courtroom identification of the defendant was made on some basis other than the showup, his identification must be excluded as evidence. The prosecution must prove that the witness can totally eliminate from recollection all observations at the pretrial identification and convince every reasonable mind that he distinctly recalls the defendant from fleeting impressions during the crime.

3. The reviewing court must consider all the facts with the object of determining the ability of the witness to observe and to retain perceptions received at the· time of the offense. It is not enough that the witness merely reiterates an ability to recognize, or the certainty of recognition, but the facts and circumstances under which the initial identification was made must be considered. The factors supporting the independent basis must be totally unrelated to any pretrial confrontation.

4. Factors which should be used in determining whether an independent basis exists for the identification include: (a) prior relationship with or knowledge of the defendant; (b) the opportunity to observe the offense; (c) length of time between the offense and the disputed identification; (d) accuracy of or discrepancies in the pre-lineup or showup description given by the witness compared with the defendant's actual appearance; (e) any previous proper identification or failure to identify the defendant; (f) any identification prior to lineup or showup of another person as the defendant; (g) the nature of the offense, the physical and psychological state of the witness, and factors such as fatigue, nervous exhaustion, alcohol and drugs, and the age and intelligence of the witness; (h) any idiosyncratic or special features of the defendant.

5. Further, the court should consider the witness's performance at, and the conduct of, the disputed lineup or showup to determine the credibility of the witness's testimony that the identification was due to perceptions received at the time of the offense. The trial court must state on the record the reasons for determining whether the prosecution has established by clear and convincing evidence that the in-court identification has a sufficient independent basis to purge the taint caused by the illegal confrontation.

Justice Coleman dissented. She wrote that she saw nothing in this case suggesting that the procedures by which the defendant was identified were impermissibly suggestive. The Court should adopt recent United States Supreme Court decisions concerning identification procedures to promote efficient criminal investigation while preserving the rights of all citizens. The Sixth Amendment does not grant the right to counsel at photographic displays conducted by the government for the purpose of allowing a witness to attempt an identification of the offender, because the adversary mechanism of the trial would expose any weakness in the procedures. Due process requires that each case must be considered on its own facts. For a conviction to be reversed, a defendant must show that the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. The trial court found that the witness's in-court identification of the defendant had a basis independent of the prior improper showup, and that the photographic identification procedures were not impermissibly suggestive.

Justices Fitzgerald, Ryan, and Blair Moody, Jr., did not participate in the decision.

Reversed and remanded for an evidentiary hearing.

OPINION OF THE COURT

1. CRIMINAL LAW—WITNESSES—IDENTIFICATION—PHOTOGRAPHS.

Counsel must be present at a photographic identification of an accused who is in custody, or where the defendant, although not in custody, is the focus of investigation, when the purpose of the identification is to build a case against the defendant by eliciting identification evidence, not to extinguish a case against an innocent bystander.

2. CRIMINAL LAW—WITNESSES—IDENTIFICATION—PHOTOGRAPHS.

Identification by photograph generally should not be used where the accused is in custody.

3. CRIMINAL LAW—WITNESSES—IDENTIFICATION—IMPROPER PROCEDURE—DUE PROCESS.

A conviction is subject to attack where the identification procedure followed is so unnecessarily suggestive and conducive to irreparable mistaken identification that the defendant is denied due process of law.

4. CRIMINAL LAW—WITNESSES—IDENTIFICATION—PHOTOGRAPHS—IM-
PROPER PROCEDURE.

A conviction based on eyewitness identification at trial following
a pretrial identification by photograph will be set aside if the
photographic identification procedure was so impermissibly
suggestive as to give rise to a very substantial likelihood of
irreparable misidentification.

5. CRIMINAL LAW—WITNESSES—IDENTIFICATION—PHOTOGRAPHS—IM-
PROPER PROCEDURE.

The use of 30 photographs of faces labelled with the subjects'
names at a photographic showup gave rise to such a likelihood
of irreparable misidentification as to amount to a denial of due
process of law where the identifying witness testified that he
recognized the defendant's name and his body build as being
the same as the person who perpetrated the crime, rather than
mentioning his facial characteristics.

6. CRIMINAL LAW—WITNESSES—IDENTIFICATION—IMPROPER PROCE-
DURE—INDEPENDENT BASIS.

An in-court identification of a defendant by an eyewitness who
has participated in an improper pretrial identification proce-
dure must be excluded as evidence unless there is a showing by
clear and convincing evidence that the identification was made
on some basis other than the improper pretrial procedure; the
prosecution must prove that the witness can totally eliminate
from his recollection all observations at the improper pretrial
identification and convince every reasonable mind that he
distinctly recalls the defendant from fleeting impressions dur-
ing the crime.

7. CRIMINAL LAW—WITNESSES—IDENTIFICATION—IMPROPER PROCE-
DURE—INDEPENDENT BASIS.

It is not enough that a witness to a crime merely reiterates an
ability to recognize or the certainty of recognition of a defend-
ant to establish an independent basis for a challenged in-court
identification, but the facts and circumstances under which the
initial identification was made must be considered by the
reviewing court with the object of determining the ability of
the witness to observe and to retain perceptions received at the
time of the alleged offense.

8. CRIMINAL LAW—WITNESSES—IDENTIFICATION—IMPROPER PROCE-
DURE—INDEPENDENT BASIS.

The factors supporting an independent basis for an in-court
identification of a defendant by a witness when a pretrial
identification has been rendered invalid must be totally unre-

lated to any pretrial confrontation, and may include factors such as consideration of the witness's opportunity for observation during the crime, prior knowledge of the defendant's identity, accuracy of description, any discrepancy between a pre-lineup description and actual appearance of the defendant, identification of any other person prior to the lineup, failure to identify the defendant on a prior occasion, the lapse of time between the crime and the lineup identification, and any idiosyncratic or special features of the defendant.

### DISSENTING OPINION

#### COLEMAN, J.

9. CRIMINAL LAW—WITNESSES—IDENTIFICATION.

*The Supreme Court should adopt recent United States Supreme Court decisions concerning identification procedures to promote efficient criminal investigation while preserving the rights of all citizens.*

10. CRIMINAL LAW—CONSTITUTIONAL LAW—RIGHT TO COUNSEL—WITNESSES—IDENTIFICATION—PHOTOGRAPHS.

*The Sixth Amendment does not grant the right to counsel at photographic displays conducted by the government for the purpose of allowing a witness to attempt a photographic identification of the offender; the adversary mechanism of the trial would expose any weakness in the procedures (US Const, Am VI).*

11. CRIMINAL LAW—DUE PROCESS—IDENTIFICATION—PHOTOGRAPHS.

*For a conviction to be reversed, a defendant should show that a photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.*

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *James J. Rostash,* Prosecuting Attorney, *Edward R. Wilson,* Director, Prosecuting Attorneys Appellate Service (by *Lee Wm. Atkinson,* Special Assistant Attorney General), for the people.

*State Appellate Defender Office* (by *Elizabeth Schwartz* and *F. Martin Tieber)* for defendant.

WILLIAMS, J. We granted leave to appeal in this case to set standards for establishing an independent basis for in-court eyewitness identification when pretrial identification has been rendered invalid. We hold that factors supporting such an independent basis must be totally unrelated to any pretrial confrontation and may include factors such as consideration of the opportunity for observation during the crime, prior knowledge of identity, accuracy of description, the existence of any discrepancy between any pre-lineup description and actual description of the defendant, identification of any other individual prior to lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification. Because such a basis was not established in the case at bar, we remand this cause for an evidentiary hearing to determine whether an independent source for identification existed.

## I—FACTS

On March 25, 1971, three men broke into a hardware store and stole a number of guns. Two of the three, James Seals and Charles Parks, later pled guilty to breaking and entering.

Parks maintained that the stolen items were taken in the trunk of Seals' car to a gas station managed by Walter Gorowski. There defendant Emil Kachar allegedly purchased all but one gun for $900.[1] The merchandise was then transferred to defendant's car, with Parks and Gorowski observing.

Over eight months after the breaking and entering, a warrant was issued for the arrest of defendant Kachar on a charge of receiving and conceal-

---

[1] Testimony by the owner of the store was that the retail value of the goods was $6,942.82.

ing the merchandise taken from the hardware store.[2]

The identification of defendant as the recipient of the stolen merchandise was crucial.

Two of the three so identifying Kachar were Seals and Parks, who had already pled guilty to the original breaking and entering. The third was Gorowski, the gas station manager.

At the time of trial, Parks had already served 3-1/2 months of a 5-to-10-year sentence on the charge. He testified to lying to the court previously.[3] Twenty-three months later, he received a special early parole.[4]

---

[2] MCLA 750.535; MSA 28.803.

[3] "*Q. (Mr. Merman, resuming):* Did you tell the court [at the time Parks pled guilty] that you had no idea to whom the guns were sold?

"*A.* Yes, I did.

"*Q.* And did you tell the court that you had no idea where the guns were sold?

"*A.* Yes, I did.

"*Q.* Did you tell the court that Seals sold the guns?

"*A.* I can't recall if I did or not.

"*Q.* And has it been fair to conclude that you were lying to the court.

"*A.* Yes.

"*Q.* Why did you lie to the court?

"*A.* Because I didn't want to incriminate anybody else. I thought that I did the crime and I would take the responsibility."

Parks admitted testifying differently in other instances at the preliminary examination from the story he was telling at trial. His reason for lying was, he said, "so that [he] wouldn't incriminate anybody". Particularly relevant to defendant's role was that Parks had testified at Seals' examination that the sale took place between the gas station and a restaurant while at trial he testified he parked near the right hand corner of the gas station and that the transaction took place inside the station. He also admitted lying at Seals' preliminary examination when he said that he had contacted Kachar, that Seals was with him when he sold the guns, and that the guns were sold at the restaurant. He acknowledged lying at Seals' examination when he said that neither he nor Seals had told Kachar where the guns were from. However, Parks contended that while his testimony as to the role of other people had been incorrect, the role of Kachar had not been. Parks also maintained that he decided to tell the truth because "lies and thieveries" had gotten him "nothing but trouble", and that Seals told the truth, contradicting his story "and hardly

Seals also identified Kachar as the recipient of the stolen goods. Seals, whose previous felony and misdemeanor convictions were brought out · by counsel, was awaiting sentencing on the breaking and entering. He told the jury he expected his testimony to be to his advantage.[5]

The third witness who identified Kachar was Walter Gorowski, the gas station manager, who came forward two weeks before Kachar's trial. This was three months after defendant's arrest, and nearly one year after the alleged transaction.

The police showed Gorowski approximately 30 photos, all of which were labelled with the subjects' names. Gorowski indicated he knew Kachar's name was connected with allegedly purchasing the stolen guns. He also said he did not know how to spell Kachar's name. However, Gorowski selected three photos of the defendant without difficulty. Although Kachar had already been arrested, counsel was not present during the photo identification.[6]

---

anybody could believe what I said". Further, he said, his whole life had changed as a consequence of spending 3-1/2 months in Jackson. "If you'd go to Jackson and see what it's like you'd change, too." Parks also said he received no promise of a parole or any promise concerning his testimony in the case.

[4] Parks' earliest release date was May 30, 1975. However, since all parties approved early parole, he was released on February 20, 1974.

[5] "*Q.* Did anybody tell you it would be to your advantage in the sentencing if you came in here and cooperated with the police?

"*A. [Seals].* Did anybody tell me it would be to my advantage? Nobody has to tell me. I know that. It should be, I mean. Perhaps it will be.

"*Q.* No way, it's got to help you?

"*A.* What?

"*Q.* It's got to help you, in your mind?

"*A.* In my mind, yes, it should, the way I look at it."

Seals was eventually placed on probation for five years. His co-defendant, Parks, was sentenced to five-to-ten years imprisonment.

[6] The nature of the photographic identification was established on a

Gorowski knew both Seals and Parks, but testified that he had never seen defendant before. He stated that Parks came into the station with some guns in the trunk of his car and drove into one of the two service station bays. Gorowski bought one of the guns for $25, but testified he destroyed it "[w]hen I found out where the guns came from". He admitted he destroyed the evidence because "I thought I would probably get in trouble over it".

Shortly after his purchase, a maroon car with two men whom he had never seen before entered the service station. Through glass doors, and while he was working, he observed Parks and one of these two men transfer the guns from the trunk of Parks' car into the trunk of the maroon car. Gorowski described this man as "big", observing he "looked like he had a beer belly, he was tall, reminded me of John Wayne". Gorowski said, however, that he had no idea how the big man was dressed. He was working the entire time the gun transaction took place.

He testified that while the "big guy" was at the station someone pointed him out and said his name was Kachar. However, he also testified that although he had discussed the case with the prosecutor some time before, it was not until the last few hours before trial that he mentioned this.

separate record. Gorowski also testified that his in-court identification was not based on the photographic examination. The court ruled, applying *People v King*, 384 Mich 310, 312–313; 181 NW2d 916 (1970), quoting *Simmons v United States*, 390 US 377, 384; 88 S Ct 967; 19 L Ed 2d 1247 (1968), "that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification", that the procedure was not so "impermissibly suggestive as to taint this witness's identification of the defendant". No separate record was made on whether there was a sufficient factual basis for establishing an independent basis for the in-court identification apart from Gorowski's statement that it wasn't. The court did not consider whether the absence of counsel at the photographic identification constituted error.

When asked why not, he explained, "I just haven't".

Two or three weeks before trial, Gorowski said he was sitting at a table in a bar, when someone in his group pointed out defendant. At the time, he said he did not think the person in the bar was the same man he had seen transferring the guns.

However, Gorowski identified defendant who was sitting in the courtroom next to defense counsel as the man he had seen in the service station. He now had no doubt it was the same person, he said, because he had better lighting in the courtroom than in the bar. Defense counsel's request to admit into evidence a photograph purporting to show the lighting conditions in the bar at the time of the identification was denied.[7]

The prosecution had moved to endorse Gorowski the Friday before trial.[8] Defense counsel's original objection to the late endorsement was changed after he interviewed Gorowski and told him that his original identification of Kachar was by photograph and that the man he saw in the bar was not the man he saw in the service station.[9] He was therefore apparently surprised when Gorowski identified the man sitting at the defendant's table as the man with the guns.[10]

---

[7] The court denied admission because the photographer testified the photo was an overexposure, that the lights were turned down after he took the picture, and that the expert had not testified the lighting conditions were the same as when Gorowski was at the bar.

[8] The prosecution notified defense counsel that Monday of the intention to endorse Gorowski.

[9] The court told defense counsel, "He [Gorowski] is a better witness for you than he is for the people."

[10] "*Q. [Prosecutor]:* Before coming into the courtroom the last few days, did you ever state to anybody that you weren't sure who this big guy was?

"*A. [Mr. Gorowski]:* Yes.

"*Q.* Why did you say that?

"*A.* Because one time I didn't think it was him.

Kachar was convicted by the jury of receiving stolen property, MCLA 750.535; MSA 28.803, and sentenced to 2-1/2-to-5 years imprisonment. The Court of Appeals affirmed, per curiam, finding that although the showup was improperly conducted in the absence of defense counsel, *People v Anderson,* 389 Mich 155, 187; 205 NW2d 461 (1973), Gorowski's in-court identification of Kachar had an independent basis and was therefore not tainted by the defective showups. The Court of Appeals noted, in particular, that the witness's emphasis in his description "upon defendant's non-facial, corporeal characterics"[11] suggested that the in-court identification would not readily be tainted by a photograph which concentrated on facial features. The panel found further support for its conclusion that Gorowski was not prejudiced by the photographic showup in his candor in confessing that the man in the bar did not look like the same person he saw in the service station. We granted leave to appeal November 21, 1974. 393 Mich 761.

## II—THE PHOTOGRAPHIC IDENTIFICATION

The Court of Appeals held that the photographic showup was improper because defense counsel was not present. In *People v Anderson,* 389 Mich 155, 180–181; 205 NW2d 461 (1973), we approved the rule then being applied by the Court of Appeals which required that counsel be present at a photographic identification of an accused who is in custody.

---

"*Q.* Why didn't you think it was him?

"*A.* Because it didn't look like the same guy.

"*[Defense counsel]:* I beg your pardon, I didn't catch that answer.

"*A.* It didn't look like the same guy."

[11] The Court of Appeals noted he described the man in the service station as "big, looked like he had a beer-belly, he was tall, reminded me of John Wayne".

We also approved the application of that rule to a situation where defendant, although not in custody, is the focus of investigation. Thus, in *People v Cotton,* 38 Mich App 763, 769–770; 197 NW2d 90 (1972), the Court of Appeals held that counsel must be present at a photographic identification when "[i]ts purpose [is] to build a case against the defendant by eliciting identification evidence, not to extinguish a case against an innocent by-stander".

This, of course, is the situation in the instant case, for defendant had already been bound over for trial when Gorowski came forward as a witness. By that time, Kachar could by no means be construed as "an innocent bystander". Thus, not only should counsel have been present at the showup, but, under the circumstances of this case, a photo showup should not have been held at all.

In *Anderson* we said: *"Subject to certain exceptions, identification by photograph should not be used where the accused is in custody."* 389 Mich 186–187 (emphasis in original).[12] The use of photographs in the case at bar falls specifically within this prohibition.[13]

---

[12] Among the situations which in a particular case, might possibly justify the use of photographs are:

"1. It is not possible to arrange a proper lineup.

"2. There are insufficient number of persons available with defendant's physical characteristics.

"3. The nature of the case requires *immediate* identification.

"4. The witnesses are at a place far distant from the location of the in-custody accused.

"5. The subject refuses to participate in a lineup and by his actions would seek to destroy the value of the identification." 389 Mich 186–187, fn 22.

[13] "No doubt there are circumstances in which the police of necessity make use of photographs, but to make use of photographs beforehand to see whether important witnesses can identify an accused person whom they are afterwards going to see is to pursue a course which is not a proper one." 389 Mich 186, quoting *Rex v Goss,* 17 Crim App R 196, 197 (1923).

It is not necessary, however, to look to *Anderson* to find the photographic showup improper. Gorowski testified that the pictures viewed at the police station were identified and labelled with the names of the subjects. He had had a previous opportunity to correlate the name of defendant with the party involved in the gun transaction, because, at the time of the transaction, a friend pointed out the man purchasing the guns and told Gorowski his name was "Kachar". Therefore, when he saw the photos with the name "Kachar", he may well have recognized the *name,* not the face. This possibility is further reinforced by Gorowski's focus on identifying the gun purchaser by body build, for at no time did he ever describe defendant's face, or indicate he remembered the gun purchaser's face, or say that there was anything distinctive about the gun purchaser's face, as opposed to his body build. The photographs were apparently of faces.

In *Stovall v Denno,* 388 US 293, 302; 87 S Ct 1967; 18 L Ed 2d 1199 (1967), the United States Supreme Court recognized a ground of attack upon a conviction where the identification procedure followed is "so unnecessarily suggestive and conducive to irreparable mistaken identification that [defendant is] denied due process of law". In *Simmons v United States,* 390 US 377, 384; 88 S Ct 967; 19 L Ed 2d 1247 (1968), this principle was applied to photo showups. "[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground * * * if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable. misidentification."

It is clear that a photographic showup should not have been made in the case at bar when

Gorowski came forward. It is also clear that counsel should have been present if the procedure was used,[14] and that the photos should not have been labelled. Thus, even apart from the absence of counsel, the photo showup was improper.

Under the circumstances of this case, the use of labelled photographs at a showup amounted to such a likelihood of irreparable misidentification as to amount to a denial of due process of law. Therefore, unless there is a showing by clear and convincing evidence that Gorowski identified Kachar when he saw him in the courtroom on some basis other than the showup, his identification of Kachar must be excluded as evidence. *United States v Wade,* 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967).[15]

Although a special record was made in the case at bar, the trial judge found the photograph showup was not impermissibly suggestive. Therefore, there was no showing that an independent basis for the in-court identification existed. We thus remand to the trial court so that such a hearing may be held.

### III—STANDARDS FOR FINDING AN INDEPENDENT BASIS

In *Anderson,* we recognized that:

"In cases where the identification procedures employed are suggestive and conducive to irreparable misidentification then, by definition, these procedures operate upon the unconscious recognition process of the

---

[14] At the very least, counsel would have been able to point out the impropriety of using photographs at that juncture.

[15] Any direct evidence relating to the defective photo showup is, of course, inadmissible. *Gilbert v California,* 388 US 263, 273; 87 S Ct 1951; 18 L Ed 2d 1178 (1967).

witness and create a likelihood that there will be a misidentification irrespective of the degree of previous acquaintanceship between the witness and the culprit and irrespective of the opportunity to observe during the commission of the crime.

"Where the procedures used are, as in this case, grossly beyond the bounds of propriety it becomes even more important to examine the evidence of what 'independent' knowledge the victim or witness had of the identity of the culprit *before* suggestive influences were brought to bear." 389 Mich 189.

Further, as the United States Supreme Court has acknowledged,

"[I]t is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before the trial." *United States v Wade,* 388 US 218, 229; 87 S Ct 1926; 18 L Ed 2d 1149 (1967), quoting Williams and Hammelmann, *Identification Parades, Part I,* [1963] Crim L Rev 479, 482.

The problem becomes, then, what factors may have a bearing upon the true basis of the witness's in-court identification to prove that the courtroom identification is not the fruit of the suspect pretrial identification. We have not before today set forth the principles on which such decisions should be based. However, it is clear that the emphasis should not be on the fact that the witness is able to point to the defendant seated next to counsel at the defense table in the courtroom and announce, "that is the person".[16] Rather,

---

[16] "Ordinarily, when a witness is asked to *identify* the assailant or thief, or other person who is the subject of his testimony, the witness's act of pointing out the accused (or other person), then and

"the prosecution at trial must prove that the victim or witness can 'totally eliminate from recollection all observations at the lineup and convince "every reasonable mind" that they distinctly recall defendant from the fleeting impressions during the [crime].'" Quinn, *In the Wake of Wade: The Dimensions of the Eyewitness Identification Cases,* 42 U Colo L Rev 135, 141 (1970), quoting *People v Caruso,* 68 Cal 2d 183, 190; 436 P2d 336, 341; 65 Cal Rptr 336 (1968).

The United States Supreme Court has suggested that courts confronting this issue might take into consideration such factors as:

"the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to the lineup of another person, the identification by picture of the defendant prior to the lineup,[17] failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification. It is also relevant to consider those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup." 388 US 241.

The *Wade* criteria, however, are suggestions

---

there in the courtroom is of little testimonial force. After all that has intervened, it would seldom happen that the witness would not have come to believe in the person's identity. The failure to recognize would tell for the accused; but the affirmative recognition might mean little against him. (Emphasis in original.)" 4 Wigmore on Evidence (3d ed, Supp), § 1130, quoted in Comment, *Erroneous Eyewitness Identification at Lineups—The Problem and Its Cure,* 5 U San Fran L Rev 85, 90 (1970) (emphasis in original). *See also United States v Toney,* 440 F2d 590, 592 (CA 6, 1971) (McCree, J., concurring), for discussion of courtroom identification as highly suggestive.

[17] Obviously, in a case involving independent basis where a photo showup was involved, this factor is irrelevant.

only, neither exclusive nor inclusive,[18] and we are not limited by them in designating relevant factors to be considered by our own courts. These factors must be considered in the light of the principle we recognized in *Anderson,* as the factor contributing most to the unreliability of eyewitness identification. That factor is the suggestibility of witnesses. 389 Mich 215–217. Only the unusual person can completely erase vestiges of the tainted identification procedure, and, the *Wade* Court recognized, witnesses, once having identified someone, will in almost every instance adhere to that identification. 388 US 229. Thus, courts have "warned against heavy reliance on the reliability of a witness who protests too positively about the source of his identifications, and have held that this testimony must be evaluated in the light of all the circumstances". *United States v Johnson,* 147 US App DC 31, 37; 452 F2d 1363, 1369 (1971). Therefore, the reviewing court must consider all the facts with the object of determining the ability of the witness to observe and to retain perceptions received at the time of the alleged offense.[19] It is not enough that the witness merely reiterates an ability to recognize, or the certainty of recognition, but the facts and circumstances of the conditions under which the initial identification was made must be considered. As we said in *Anderson,* "Given the dangers of misidentification resulting from the

[18] Indeed, at least one expert has suggested, "it is unfortunate that the Court was not more explicit in this area". Sobel, *Assailing the Impermissible Suggestion: Evolving Limitations on the Abuse of Pre-Trial Criminal Identification Methods,* 38 Brooklyn L Rev 261, 312 (1971).

[19] Logically, then, this also precludes consideration of so-called "external factors" such as possession of fruits of the crime or testimony of accomplices. External factors are not known to the witness *during* the commission of the crime. Such factors while evidence relating to the guilt or innocence of defendant, are *not* relevant to determining whether the in-court identification had an independent basis.

vagaries of perception, memory, recognition and the impact of suggestion, it becomes important to understand another factor singled out in *Wade* and *Simmons*—the effect upon a witness of having made an identification. Both *Wade* and *Simmons* recognize that the first identification may well be irreparable whether right or wrong because the witness who made that identification will be greatly influenced by what he then perceived and decided." 389 Mich 217–218.

Thus, while the nature of the lineup or showup, or possession of the fruits of the crime, may not be properly considered to determine whether the in-court identification has an independent basis, the other *Wade* factors are appropriate, as they apply to either the opportunity to observe or to the credibility of the witness.

Thus, factors which the court should use in determining whether an independent basis exists should include:

1. Prior relationship with or knowledge of the defendant.

2. The opportunity to observe the offense. This includes such factors as length of time of the observation, lighting, noise or other factor affecting sensory perception and proximity to the alleged criminal act.

3. Length of time between the offense and the disputed identification. See *Anderson,* 389 Mich 214, for analysis of the curve of forgetting.

4. Accuracy or discrepancies in the pre-lineup or showup description and defendant's actual description.

5. Any previous proper identification or failure to identify the defendant.

6. Any identification prior to lineup or showup of another person as defendant.

7. Still another consideration, not mentioned in
*Wade,* but essential to a determination of judging
the reliability of the witness's perceptions is the
nature of the alleged offense and the physical and
psychological state of the victim. "In *critical situa-
tions* perception will become distorted and any
*strong* emotion (as opposed to mildly emotional
experiences) will affect not only what and how
much we *perceive,* but also will affect our *memory*
of what occurred." 389 Mich 211. (Emphasis in
original.)

Factors such as *"fatigue, nervous exhaustion,
alcohol and drugs",* 389 Mich 213 (emphasis in
original), and age and intelligence of the witness
are obviously relevant. Levine and Tapp, *The Psy-
chology of Criminal Identification: The Gap from*
Wade *to* Kirby, 121 U Pa L Rev 1079, 1102–1103
(1973).[20]

8. Any idiosyncratic or special features of de-
fendant.

Further, the court should refer to the actual
lineup or showup to determine whether the wit-
ness's testimony that the identification was due to
perceptions received at the time of the alleged

---

[20] Other courts have applied this concept in a variety of ways. Thus,
for example, an independent basis was not found where the witness
saw the robber who wore a hat and a heavy coat for only a few
minutes "during a *frightening and upsetting* episode". *People v
Ballott,* 20 NY2d 600, 607; 233 NE2d 103, 107 (1967) (emphasis
added). In yet another case, in spite of the traumatic nature of the sex
offenses involved and although the victim was only 14 years old, the
court was persuaded of the validity of the witness's perceptions
because she had spent approximately 1-1/2 hours with defendant
while he drove her through lighted areas. *Hampton v State,* 85 Nev
720, 721; 462 P2d 760, 762 (1969).

Sometimes the special training of the witness may be highly signifi-
cant. For example, an independent basis was found where one of the
witnesses "was a bank teller who had experienced other robberies,
who had remained *calm* during this robbery, and who had been
*trained to observe* carefully the face and appearance of persons who
came into the bank". *United States v Butler,* 405 F2d 395, 396 (CA 4,
1968) (emphasis added).

offenses is credible in view of the witness's performance at, and the conduct of, the disputed lineup or showup.

The court should attempt, in its evidentiary hearing, to examine as many factors as are applicable to a particular case. All will not be of equal weight, but it is within the trial court's discretion, keeping in mind the appropriate legal and psychological principles to determine, on balance, whether the prosecution has carried its burden of proof.

Upon consideration of such relevant factors, the trial court must state on the record the reasons for determining whether the prosecution has established by clear and convincing evidence that the in-court identification has a sufficient independent basis to purge the taint caused by the illegal confrontation.[21]

"In summary, an in-court identification has an 'independent source' when the suppression hearing judge can find on the basis of the factors discussed, that the identifying witness by drawing on his memory of the events of the crime and his observations of the defendant, has retained such a definite image of the defendant that he is now able, in court, to make an identification of the defendant without dependence upon or assistance from the tainted pre-trial confrontation and unaffected by any promptings or suggestions which there took place." 38 Brooklyn L Rev 261, 318.

## IV—THE CASE AT BAR ANALYZED

Applying the seven-factor test for independent identification to the present case, we find that there are unanswered questions. Since Gorowski

---

[21] *See United States v Scott,* 518 F2d 261, 267 (CA 6, 1975); *People v Hutton,* 21 Mich App 312, 329–332; 175 NW2d 860 (1970), for the appropriate evaluation technique.

was the only person not involved in the breaking and entering who identified Kachar, it could hardly be held that his testimony, if improperly admitted, was harmless error. Therefore, it becomes necessary to remand this case for a special hearing to determine whether there was a basis for independent identification. At such a hearing any pertinent factors in addition to the seven herein developed should, of course, be considered.

Turning then to the evidence pertinent to an independent basis of identification developed at trial (there was no special hearing on the subject) we find the following:

1. *Prior relationship with or knowledge of the defendant.* There was no evidence that Gorowski had seen or heard of Kachar before the alleged crime.[22]

2. *Opportunity to observe the offense.* Gorowski, pumping gas at his service station, saw the back of a person's head as he drove into one of the garage bays. He subsequently saw him and another person transferring guns from one car to another. At that time he got a full face view for a brief time looking through a glass door from about 40 feet away.[23]

3. *Length of time between offense and disputed identification.* Gorowski identified defendant at trial nearly one year after the alleged crime[24] and

---

[22] *Compare, People v Townsend,* 60 Mich App 204, 207; 230 NW2d 378 (1975), where witness had previously seen the defendant when he stayed at the complainant's house and *recognized* him as the one who had previously stayed there, and as well, communicated his recognition.

[23] *Compare, People v Childers,* 20 Mich App 639, 649; 174 NW2d 565 (1969) (witness viewed the robbery from the gas station office but then went to the victim's aid, getting a close look at the robber).

[24] *Compare United States v Scott,* 518 F2d 261, 265 (CA 6, 1975), where identification was made within a few hours of the crime while the memories of the witnesses were still fresh.

misidentified defendant at the bar about three weeks before the trial.

4. *Accuracy of prior descriptions and actual description.* Gorowski identified the man involved in receiving the stolen guns as "big" and that he "looked like he had a beer belly, he was tall, reminded me of John Wayne". There didn't appear to be anything in the record to indicate how accurate this description was.

Gorowski seems to have identified defendant promptly at the photo showup, but it is not clear whether he did this from name identification or otherwise.

5. *Previous identification or failure to identify defendant.* Before trial, Gorowski failed to identify Kachar at a bar but explained this by saying the light was not good.

6. *Previous identification of another person as defendant.* None.

7. *Witness's emotional condition at time of alleged crime.* There is no indication Gorowski suffered from "fatigue, nervous exhaustion, alcohol or drugs" at the time of the alleged crime. Neither is there any indication he was excited or otherwise emotionally involved. He did seem curious as to what was going on and who was involved, as he asked someone he knew who the stranger was.

Summing up such analysis as can be made from the record, it would appear that Gorowski had no prior acquaintance with nor knowledge of Kachar. Gorowski was not particularly well positioned to see the alleged receiver of the stolen goods nor did he have very long to observe the transaction. The in-court identification was a year after this brief sighting and after Gorowski had failed to identify Kachar in a bar three weeks before. The photo showup identification, although prompt, was equiv-

ocal because each of the pictures had the name of the person on it and Gorowski had heard Kachar's name at the time of the transfer of the guns. Gorowski was curious as to what was going on and who was involved so he may have observed more closely than if he had been uninterested.

The facts as we have them add up to a difficult judgment, as the factors are both negative and positive with no evident preponderance. There is not on the present record sufficient evidence to determine that Gorowski did not have a basis for independent identification and likewise it would be difficult to decide that there was sufficient independent basis so that the defendant could be convicted beyond a reasonable doubt by this critical witness. However, because the trial court never had an opportunity to weigh these factors and to perhaps examine additional evidence, it does not seem advisable for us to make a decision on the basis of what may well be an incomplete evidentiary profile.

### V—CONCLUSION

We therefore reverse the Court of Appeals and remand to the trial court for an evidentiary hearing in which the court will apply, within its sound discretion, such factors as will enable it to determine whether a basis independent of the tainted showup existed for the in-court identification. Should the court determine there was no such independent basis, a new trial shall be ordered. At such a trial, of course, Gorowski's identification of Kachar shall be excluded.

As to other causes where the issue of tainted identification may arise, after the date of this decision, the trial court shall conduct an eviden-

tiary hearing on a basis not inconsistent with the principles expressed in *Anderson* and this decision.

LEVIN, J., concurred with WILLIAMS, J.

KAVANAGH, C. J., concurred in the result.

FITZGERALD, RYAN, and BLAIR MOODY, JR., JJ., took no part in the decision of this case.

COLEMAN, J. *(dissenting).* The Court has remanded this case for an evidentiary hearing concerning an eyewitness identification of the defendant. I see no need to remand. There is nothing in this case suggesting that the procedures by which defendant was identified were impermissibly suggestive. I would affirm.

In *People v Jackson,* 391 Mich 323, 357; 217 NW2d 22 (1974), and *People v [James] Anderson,* 391 Mich 419, 424; 216 NW2d 780 (1974), I urged the Court to adopt recent United States Supreme Court opinions concerning identification procedures. It was thought those opinions "would promote efficient criminal investigation while preserving the rights of all citizens". As in *Jackson* and *Anderson,* the present opinion does not as effectively serve those ends.

The trial in *United States v Ash,* 413 US 300; 93 S Ct 2568; 37 L Ed 2d 619 (1973), occurred three years after the crime. The prosecutor "decided to use a photographic display to determine whether the witnesses he planned to call would be able to make in-court identifications". During trial, there was "a hearing on the suggestive nature" of the display. The trial judge said the prosecutor had shown that "in-court identifications would be 'based on observation of the suspect other than the intervening observation' ".

The Supreme Court held "that the Sixth Amendment does not grant the right to counsel at photographic displays conducted by the Government for the purpose of allowing a witness to attempt an identification of the offender". The Court said the "adversary mechanism" would expose any weakness in the procedures. Defendant could urge the trial court "to examine this photographic display under the due process standard enunciated in *Simmons v United States*, 390 US [377], at 384 [88 S Ct 967; 19 L Ed 2d 1247 (1968)]."

In *Simmons*, the Court was "unwilling to prohibit" the use of photographic identification "either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement". The Court held "that each case must be considered on its own facts". To reverse a conviction, defendant must show that the "photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification".

That was the standard which Mr. Kachar's attorney used to challenge the photographic identification in our case. About two weeks before trial, a Mr. Gorowski offered himself as a witness. Before trial, he was shown 30 photographs and selected three of defendant. He also identified defendant at trial.

When Mr. Gorowski began to testify about the photographs, defendant's counsel had the jury excused and then examined Gorowski about the procedure. He said it "is important for the court to know, because if [the procedure] was so impermissibly suggestive to give likelihood—a substantial likelihood of irreparable misidentification, then it is out in its entirety".

The examination and sparring between counsel

take up 20 pages of transcript. The trial judge understood the *Simmons* test and allowed Mr. Kachar's counsel an opportunity to explain why the procedure was wrong. However, the trial judge "[didn't] find that this identification procedure was so impermissibly suggestive as to taint this witness's identification of the defendant".

The Court of Appeals said "the instant record clearly supports the trial court's determination of the *Simmons* issue". However, the Court felt *People v [Franklin] Anderson,* 389 Mich 155; 205 NW2d 461 (1973), required it to determine if "Gorowski's in-court identification of defendant [had] a basis independent of the prior improper show-up?" It concluded "that such an independent basis did exist and that Gorowski's in-court identification of defendant was therefore not tainted by the defective show-up".

I have indicated my opinion about *Anderson.* See *People v Jackson,* 391 Mich 323; 217 NW2d 22 (1974). I do not believe it requires retroactive application. *Anderson* was decided March 27, 1973. Mr. Kachar's trial occurred in March, 1972.

Two of the men who stole the guns testified that Mr. Kachar purchased them. They were subject to cross-examination. Mr. Gorowski's testimony was also thoroughly cross-examined. Mr. Kachar's attorney employed the *Simmons* test. He had an opportunity to attack the photographic identification procedures. He could not convince the court that they were impermissibly suggestive.

I would affirm the conviction.