*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

LEWIS TERRELLE MCNEIR,

      Defendant-Appellant.

UNPUBLISHED
December 21, 2023

No. 361410
Oakland Circuit Court
LC No. 2019-272767-FC

Before: LETICA, P.J., and O'BRIEN and CAMERON, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of first-degree premeditated murder, MCL 750.316(1)(a), felon-in-possession, MCL 750.224f(2), and two counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b(1). The trial court sentenced defendant, as a second-offense habitual offender, MCL 769.10, to life in prison for the murder conviction and 2 to 7½ years' imprisonment on the felon-in-possession conviction to be served consecutively to their respective two-year mandatory sentence for felony-firearm, which were to be served concurrently to each other. On appeal, defendant contends that he was denied his right to a fair trial and due process when the trial court denied his motion for a *Wade*[1] hearing, and further contends that he was denied the effective assistance of counsel. We affirm.

## I. BACKGROUND

In the early morning hours of August 25, 2019, Dajon McNeir ("Dajon") and his cousin Dennis Lee III ("Lee") were on the porch of Dajon's apartment at 743 Whittemore in the city of Pontiac, when a man walked toward them. Lee asked, "[W]ho's that?" As the man got closer, Dajon recognized the man as defendant, his half-brother. Dajon asked defendant "what's up," and defendant said: "I'm back." Defendant stood in front of Lee and said, "what's up," several times to Lee. Receiving no response, defendant pulled out a gun and shot Lee in the chest. As Lee turned and fled into the house, defendant shot him in the back, then ran down the street. There

---

[1] *United States v Wade*, 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967).

was videotape from that location admitted at trial. Dajon called 911 and Lee was transported to the hospital, where he died a short time later from one close-range gunshot to his chest and a second gunshot to his back.

Dajon was interviewed by police approximately one hour after the shooting. He provided them with a description of the shooter and the clothing the shooter wore, but he did not identify defendant and denied that he knew who the shooter was. After leaving the police station and gathering with family members, however, Dajon shared that defendant shot Lee.

Lee's mother, Tameka Lee ("Tameka"), was asked by one of her brothers, who was a Wayne County police officer, if she knew "Lewis." Tameka knew he was talking about Dajon's brother (defendant) or his father, who shared that name. Tameka's sister and cousin told her that defendant shot Lee. After Tameka learned that defendant was there when Lee was shot, she went to another house, found Dajon there, and Dajon told her who had shot her son.

Tameka went to the police station, telling them that she had information about who had shot her son. She also reported that she had heard that Lee has been texting with the mother of defendant's children.[2] The police asked if Dajon would come in and be willing to talk to them. She responded affirmatively. She then located him and drove him to the police station later the same day. He then identified defendant as the shooter.

Within days of the shooting, a witness appeared at the police station and told them she had been with Lee shortly before his death. The witness, Kaniqua Rouser, told the police to look at surveillance video from a Sunoco station near Dajon's house because she had taken Lee to the Sunoco station and a car had followed them from the Sunoco station to Dajon's house. Rouser testified that Lee told her he had previously gotten into an altercation with the person in the car. After viewing surveillance video from the Sunoco station, the police were able to identify the car Rouser had described as having followed them and located the owner of the car, Dajhauh Brown. The video also showed that defendant was wearing dark pants and a coat with a gray hoodie underneath it. Dajon had described that shooter as wearing a gray Nike sweater/hoodie, black pants, and snake skin Jordan shoes.

Brown testified at trial that defendant was her live-in boyfriend at the time of the incident and that they had been together the night before the shooting. Brown testified that defendant had driven her car, with her as a passenger, to the Sunoco station sometime after 4:00 a.m. on August 25, 2019, then dropped her off at home and left in her car. She met defendant at a hotel in the afternoon hours of August 25, 2019 and, after staying the night there, she dropped defendant off at a bus station because he told her he had to go to Atlanta.[3] Defendant's father, who lived in

---

[2] The mother of defendant's children denied that she knew Lee and testified that she never texted with him.

[3] Brown told police that defendant was going out-of-town to visit his brother or attend a party.

Georgia, contacted Brown and told her that she needed to take $2,200 he was sending her to a lawyer, which she did. Defendant eventually turned himself in to the police on August 30, 2019.

After his preliminary examination, defendant moved for a *Wade* hearing, arguing that Dajon's identification of defendant should be suppressed because it was the result of unduly suggestive procedure and, in light of the totality of the circumstances, it led to a substantial likelihood of misidentification. The trial court denied the motion and the matter proceeded to a jury trial. The jury found defendant guilty of all four charged crimes[4] and the trial court sentenced him. This appeal followed.

## II. *WADE* HEARING

Defendant first argues that he was denied his right to due process and a fair trial when the trial court denied his motion for a *Wade* hearing. We disagree.

This Court reviews the trial court's decision whether to hold an evidentiary hearing, such as a *Wade* hearing, for an abuse of discretion. *People v Craft*, 325 Mich App 598, 609; 927 NW2d 708 (2018). An abuse of discretion occurs if the trial court's decision falls outside the range of principled outcomes. *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019) (citations omitted).

A *Wade* hearing is "[a] pretrial hearing in which the defendant contests the validity of his or her out-of-court identification." *Black's Law Dictionary* (11th ed). Determining whether a *Wade* hearing is necessary is essentially a two-step process. First, the defendant must establish that a witness was exposed to a pretrial identification procedure that "was so impermissibly suggestive in light of the totality of the circumstances that it led to a substantial likelihood of misidentification." *People v Kurylczyk*, 443 Mich 289, 302; 505 NW2d 528 (1993) (citations omitted). Second, if a witness is exposed to an impermissibly suggestive pretrial identification procedure, the trial court must determine whether the witness had an independent basis to identify the defendant before the witness's in-court identification may be received as evidence. *People v Gray*, 457 Mich 107, 115; 577 NW2d 92 (1998).

In *People v Kachar*, 400 Mich 78, 95-96; 252 NW2d 807 (1977), our Supreme Court set forth eight factors that courts are to use in determining whether an independent basis for identification exists. Those factors are:

1. Prior relationship with or knowledge of the defendant.

2. The opportunity to observe the offense. This includes such factors as length of time of the observation, lighting, noise or other factor affecting sensory perception and proximity to the alleged criminal act.

3. Length of time between the offense and the disputed identification. []

---

[4] The parties stipulated that defendant was a convicted felon and ineligible to possess a firearm.

4. Accuracy or discrepancies in the pre-lineup or show-up description and defendant's actual description.

5. Any previous proper identification or failure to identify the defendant.

6. Any identification prior to lineup or showup of another person as defendant.

7. Still another consideration . . . is the nature of the alleged offense and the physical and psychological state of the victim. []

8. Any idiosyncratic or special features of defendant.

We review the trial court's findings concerning an independent basis for clear error. *Gray*, 457 Mich at 115.

"[W]here the defendant fails to support the allegation of impropriety with factual support or where it is clear from the record that such a hearing would be futile in light of substantial evidence that there exists an independent basis for the identification," a defendant is not entitled to a *Wade* hearing. *People v Johnson*, 202 Mich App 281, 287; 508 NW2d 509 (1993). Conversely, where defendant has supported his claim of impropriety but the record is insufficient to determine whether an independent basis for identification exists, a *Wade* hearing may be necessary.

In this case, defendant does not argue that any pretrial procedures undertaken by the investigating police body (the Oakland County Sheriff's Department) were unduly suggestive or impermissible. As admitted by defendant, this matter does not involve the typical allegedly suggestive lineup or photographic array scenarios addressed in most *Wade* hearing requests. See, e.g., *Kurylczyk*, 443 Mich 293; *Craft*, 325 Mich App 609. Rather, defendant argues that a Wayne County law enforcement officer was identified as being among Lee's family members gathered at the scene after the shooting. That family member, according to defendant, was the first person to bring up the name "Lewis" to Tameka, who, in turn, took Dajon to the police station for a second time before he identified defendant as the shooter.

It is highly unlikely that the involvement of this's Wayne County law enforcement officer can be considered an impermissibly suggestive pretrial procedure. First, there has been no identification of this relative. Second, there has been no allegation that this relative spoke to the *identifying witness*, Dajon, or mentioned the name "Lewis" to Dajon. Third, there was nothing in the record suggesting that Tameka relayed the name "Lewis" to Dajon or told him what she and the Wayne County law enforcement officer had discussed. There has also been no evidence that the police directed Tameka to bring Dajon back to the police station; any allegation of police "direction" is conjecture rather than factual support for defendant's position. That being so, and defendant having failed to direct this Court to any law or case indicating that the scenario in this matter presents the same type of situation warranting a *Wade* independent-basis analysis, defendant has failed to supply any factual support for his claim. Defendant has thus failed to meet the first step in establishing the need for a *Wade* hearing — that a witness was exposed to a pretrial identification procedure that was so impermissibly suggestive "in light of the totality of the circumstances that it led to a substantial likelihood of misidentification." *Kurylczyk*, 443 Mich at

302. The trial court therefore did not abuse its discretion in denying defendant's motion for a *Wade* hearing. *Johnson*, 202 Mich App at 287.

Despite the above, the trial court undertook a thorough analysis and reviewed defendant's request for a *Wade* hearing using the independent-basis factors set forth in *Kachar*, 400 Mich at 95-96. Although defendant himself did not review the eight factors or present any argument whether the trial court clearly erred in any of its findings on the factors, this Court reviewed each finding for purposes of thoroughness. We discern no error in the trial court's findings on any of the factors, taking particular note of the record evidence that Dajon is defendant's half-brother and testified at the preliminary examination that defendant came within mere steps of him and Lee on an illuminated porch before shooting Lee in the chest. Because it is clear from the record that a *Wade* "hearing would be futile in light of substantial evidence that there exists an independent basis for the identification," the trial court did not abuse its discretion when it denied defendant's motion for an evidentiary hearing. *Johnson*, 202 Mich App at 287.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant did not raise any claim of ineffective assistance by moving for a new trial or by requesting a *Ginther*[5] hearing in the trial court, or by filing a motion to remand with this Court on this basis.[6] We review unpreserved claims of ineffective assistance of counsel, such as this one, for errors apparent on the record. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004).

A claim of ineffective assistance of counsel "presents a mixed question of fact and constitutional law." *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011). Appellate courts review the trial court's findings of fact, if any, for clear error, but review the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo. *Id*.

"Effective assistance of counsel is presumed, and a defendant bears a heavy burden to prove otherwise." *People v Traver (On Remand)*, 328 Mich App 418, 422; 937 NW2d 398 (2019), quoting *People v Swain*, 288 Mich App 609, 643; 794 NW2d 92 (2010). To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that, but for counsel's error, there was a reasonable probability that the outcome of the proceedings would likely have been different. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018).

Defendant asserts that his trial counsel was ineffective because, during his cross-examination of Kaniqua Rouser at trial, counsel elicited testimony that was damaging to defendant. Specifically, defendant directs this Court to the following exchange between defense counsel and Rouser:

---

[5]*People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

[6] *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020).

*Rouser*:  . . . Like I said, he did tell me.  He say he got into it with a [black man] name[d] Lou.  And when I say altercation, I told—those were my words.  I said he had an altercation with someone.

*Defense Counsel*:  Okay.

*Rouser*:  I said altercation.  What he told me is he got into it with a [black man] named Lou before.

Rouser further testified that Lee told her that it was Lou that had followed them from the Sunoco station.  Rouser testified she did not want to be involved in the matter.

As indicated by defendant, on direct examination, Rouser had not testified that Lee told her anything about a man named Lou.  However, it can be clearly seen from the record that Rouser's disclosure about a man named Lou was not anticipated by defense counsel and that when cross-examining Rouser, defense counsel was attempting to discredit Rouser by eliciting testimony that she had withheld information from the police.

*Q*.  Okay, thank you.  Now, excuse me just one second.  You mentioned something during that interview about an inner - - an altercation from before, do you remember that?

*A*.  Yep, yes, I did.

*Q*:  Yes, and you told that to the detectives back on August 26.

*A*.  I sure did.

*Q*.  That's not an altercation that happened that night.  You said from before, right?

*A*.  Yes.

*Q*.  Some other day.

*A*.  Yes.

*Q*.  Okay, and that was your understanding of what it was that [Lee] was relating to you, right?

*A*.  That's how he knew him, I guess, I mean, you know, they had –

*Q*.  Whoever that person in that other car was, that he was worried about.

*A*.  Yes, uh-hmm.

*Q*.  He never gave you a name, correct?

*A*.  He did.

-6-

*Q.* Well, you didn't tell any name to Detective –

*A.* I sure didn't because --

*Q.* --Thomas.

*A.* --I didn't, I didn't -- I did not want to be in that. I didn't want to be (indiscernible) that is my friend and (indiscernible) I did. Like I said, he did tell me. He say he got into it with a n***** name[d] Lou. And when I say altercation, I told -- those were my words. I said he had an altercation with someone.

*Q.* Okay.

*A.* I said altercation. What he told me is he got into it with a n***** named Lou before.

*Q.* And you said you told that to Detective Thomas?

\* \* \*

*A.* No.

*Q.* All right, so you're telling -- now, don't you think that would have been relevant to tell Detective Thomas when you go over there to tell him what you know about this case?

*A.* Yeah, it would have been relevant, but I—

*Q.* Yeah, it would have been relevant.

When the unfavorable testimony was provided, defense counsel did not unduly focus on the name provided, but instead continued his defense strategy of trying to establish that Rouser was not a trustworthy witness:

*Q.* Okay, so what you're telling me today or this jury today is that when you sat down to talk to Detective Thomas, even though they didn't bring you down to the police station or anything like that, you went there on your own, you lied to them.

Considering that there was no physical evidence linking defendant to the shooting and the trial turned on the credibility of witnesses, defense counsel's trial strategy of exposing the trial witnesses as less than truthful was sound. "A particular strategy does not constitute ineffective assistance of counsel simply because it does not work." *Matuszak*, 263 Mich App at 61 (citation omitted). And "[t]his Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight." *People v Garza*, 246 Mich App 251, 255; 631 NW2d 764 (2001).

Moreover, even if defense counsel's single instance of eliciting damaging testimony on cross-examination was seen as falling below an objective standard of reasonableness, given the strength of the eyewitness testimony and other evidence against defendant, there is not a reasonable probability that, but for this error, the result of the proceedings would likely have been different. *Head*, 323 Mich App at 539. Brown testified that she and defendant went to the Sunoco station after 4:00 a.m. on the day of the incident and were supposed to get food after; however, defendant abruptly changed his mind and dropped her off at home, taking her car. Brown identified her car on surveillance video as being in the parking lot of the apartment where the shooting occurred around 4:20 a.m. on the day of the incident and testified she was not driving her car at that time. In addition, Dajon unequivocally testified that defendant, his half-brother, shot Lee, and there was no indication of any bad feeling or animosity between defendant and Dajon. Thus, a reasonable jury could have easily convicted defendant of the charged crimes even without Rouser's damaging testimony.

Defendant also claims that his trial counsel was ineffective for failing to move for a directed verdict at the close of the prosecution's case despite the trial court's inquiry. Notably, defendant presents no argument as to why he believes a directed verdict motion would have been successful. Indeed, he presents no law or argument whatsoever concerning a directed verdict. Defendant "may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims . . . ." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Defendant's "failure to properly address the merits of his assertion of error constitutes abandonment of the issue." *People v Harris*, 261 Mich App 44, 50; 680 NW2d 17 (2004). Defendant having abandoned this issue, we need not consider it.

Regardless, there was sufficient evidence to support defendant's convictions at the conclusion of the prosecution's proofs and counsel was not ineffective for failing to move for a directed verdict. See *People v Riley*, 468 Mich 135, 142; 659 NW2d 611 (2003). "When reviewing a trial court's decision on a motion for a directed verdict, this Court reviews the record de novo to determine whether the evidence presented by the prosecutor, viewed in the light most favorable to the prosecutor, could persuade a rational trier of fact that the essential elements of the crime charged were proved beyond a reasonable doubt." *People v Aldrich*, 246 Mich App 101, 122; 631 NW2d 67 (2001). In this case, viewing the evidence in the light most favorable to the prosecution, a rational juror could find that the elements of first-degree premeditated murder, felon-in-possession, and felony-firearm were proven beyond a reasonable doubt. The elements of first-degree murder are the intentional killing of a human with premeditation and deliberation. *People v Oros*, 502 Mich 229, 240; 917 NW2d 559 (2018). The elements of felon-in-possession are that a felon convicted of a specified felony possessed or used a firearm without having his gun rights restored. MCL 750.224f(2). And the elements of felony-firearm are that a person carried or possessed a firearm when he committed or attempted to commit a felony. MCL 750.227b(1). The prosecution presented surveillance video of Brown's car, which she testified she was not driving on the night of the incident, at the Sunoco station, then in the Whittemore Street parking lot very shortly before the murder. Dajon testified he saw defendant walk up to him and Lee and use a gun to repeatedly shoot Lee from just steps away. Lee died from his injuries. Moreover, the parties stipulated that defendant was a convicted felon, who was ineligible to possess a firearm.

Even this limited testimony and evidence was sufficient to withstand a motion for directed verdict. Because counsel is not ineffective for failing to make a futile motion, *People v Henry (After Remand)*, 305 Mich App 127, 141; 854 NW2d 114 (2014), and a motion for directed verdict would have been futile, defense counsel was not ineffective for failing to move for directed verdict. *Riley*, 468 Mich at 142.

Affirmed.

/s/ Anica Letica
/s/ Colleen A. O'Brien
/s/ Thomas C. Cameron