**Terry D. ROBERTSON, Plaintiff,**

v.

**Joseph ABRAMAJTYS, Defendant.**

**No. 99–CV–71557–DT.**

United States District Court,
E.D. Michigan,
Southern Division.

April 5, 2001.

Terry Robertson, Kincheloe, MI, pro se.

Janet Van Cleve, Michigan Department of Attorney General, Habeas Corpus Division, Lansing, MI, for Respondent.

## MEMORANDUM OPINION AND ORDER

FRIEDMAN, District Judge.

This matter is before the Court on Magistrate Judge Steven D. Pepe's Report and Recommendation dated February 27, 2001. No objections have been filed.

This Court has had an opportunity to fully review this matter and believes that the Magistrate Judge has reached the correct conclusions for the proper reasons.

ACCORDINGLY:

IT IS HEREBY ORDERED that Magistrate Judge Steven D. Pepe's Report and Recommendation dated February 27, 2001, is hereby accepted and adopted.

IT IS FURTHER ORDERED that Petitioner's application for federal habeas relief is hereby denied.

## REPORT AND RECOMMENDATION

PEPE, United States Magistrate Judge.

Petitioner Terry D. Robertson ("Petitioner") filed this *pro se* application for federal habeas relief under 28 U.S.C. § 2254, which was referred for report and recommendation under 28 U.S.C. § 636(b)(1)(B). Because Petitioner has procedurally defaulted two of his claims without showing prejudice or a miscarriage of justice, and because Petitioner's other claim is without merit, his application for habeas relief should be denied.

## I. BACKGROUND

### A. *Facts*

Petitioner was convicted of assault with intent to commit criminal sexual conduct.

Mich. Comp. Laws § 750.520g(1). The conviction arises from the assault of Ms. Terry Laster in Ypsilanti, Michigan during the early morning hours of December 30, 1995. Petitioner was found not guilty of criminal sexual conduct in the first degree with respect to this event.

At trial, Ms. Laster testified that she consumed around twelve beers at two Ypsilanti bars the evening of the assault, and then left the second bar to walk home. At around 1:00 a.m. she was approached by a black male on Michigan Avenue whom she identified at trial as Petitioner. Trial Transcript II at 81. She stated that the man asked whether she would like to go for a drink, and later offered her crack cocaine. Id. at 82. After Ms. Laster refused to go with the man and continued walking towards her home, she felt an arm around her neck. The man then dragged her to the porch of an abandoned house while holding his hand over her mouth. Id. at 83. After beating her face with his fist and taking her pants partially off, the man penetrated her vagina with his penis while she was lying on the ground on her back.[1] Id. at 87. When this was over the man took Ms. Laster's wallet in which there were items of identification, money, and a calling card belonging to her former boyfriend, Tom Hemlinger. Id. at 91–92.

Connie Koski, an Ypsilanti Police Department ("YPD") officer then serving a rotation in the detective bureau, testified for the prosecution. She testified that she found a wallet in Petitioner's property after his arrest that contained an Ameritech calling card bearing the name Tom Hemlinger. Trial Transcript IV at 37–38. On January 19, 1996, Detective Koski compiled a photographic array containing Petitioner's picture and presented it to Ms. Laster. Id. at 67. She did not identify Petitioner's photograph. Id. at 69–70. On February 2, 1996, Ms. Laster again failed to identify Petitioner's photograph in the second array Officer Koski presented her. Id. at 71–74. Koski stated that Ms. Laster's blood tested negative for cocaine and registered a .10 blood alcohol level. Id. at 46. Detective Troy Fulton of the YPD testified that he interviewed Petitioner after his arrest. Trial Transcript III at 71. Detective Fulton stated that Petitioner told him that after he met Ms. Laster as they were walking along Michigan Avenue together, they smoked some crack cocaine. After Ms. Laster tried to leave and Petitioner would not let her, she became violent with him. He punched her in the face, and drug her to the porch of the abandoned house. Id. at 88–89. Petitioner told Ms. Laster that she had to reimburse him for the drugs by having sexual relations with him. Id. at 89. Then she calmed down and stated that she would pay Petitioner for the cocaine with cash. Id. at 89, 91. When Petitioner would not agree with this suggestion, she agreed to have sexual relations with him. Id. at 91. After intercourse, Petitioner took Ms. Laster's wallet which had fallen on the ground before leaving her at the abandoned house. Id. at 93. Anthony Noland, a cousin of Petitioner, was stopped by the police shortly after the incident. Trial Transcript V at 7, 53. Noland testified that later that night he spoke with Petitioner about his earlier encounter with the police, and Petitioner admitted to raping the "girl" about which the police had questioned Noland. Trial Transcript V at 10.

---

1. On cross examination Ms. Laster was impeached with prior inconsistent statements on whether she was actually penetrated. Trial Transcript II at 124. Presumably this is why Petitioner was acquitted on the charge of criminal sexual conduct in the first degree. Because this issue is not related to any of Petitioner's claims in this habeas petition, no further attention to it is necessary.

Petitioner testified in his own defense. He testified that the statement he had made to Detective Fulton was a lie. Id. at 77. Petitioner contrived the statement because he was afraid that Detective Fulton was going to assault him if he did not confess. *Id.* at 77. Petitioner stated that Detective Fulton had pounded the desk in the interview room where they were alone, jumped up, and yelled in his face. *Id.* at 66–67. Defense counsel sought to admit evidence that Petitioner had suffered assaults at the hands of police officers on previous occasions, but the trial court sustained the prosecutor's objection to this evidence. *Id.* at 70–74. Petitioner testified that he was with Michael Sullivan and Raymond Akins before 1:00 a.m., and Ms. Christine Macksegian around 1:00 a.m. *Id.* at 87–92. Other pertinent evidence will be discussed as it pertains to the legal issues discussed.

### B. *Procedural Background*

The Michigan Court of Appeals affirmed the conviction and sentences on October 2, 1998. *People v. Robertson,* No. 202986 (Mich.App.). On appeal, Petitioner raised the following claims: (1) during its case in chief the prosecution shifted the burden of proof by soliciting testimony on Petitioner's alibi notice; (2) the trial court infringed on Petitioner's right to compulsory process when it prevented him from testifying about alleged prior assaults on him by the police when his defense at trial was that his confession was coerced by the police; and (3) the trial court allowed in-court identification testimony by the complainant that was tainted by prior suggestive identification procedures depriving Petitioner of his right to due process and a fair trial.

Petitioner attempted to seek leave to appeal with the Michigan Supreme Court, but his pleadings were rejected as untimely because they were not filed within the 56–day period established by Michigan Court Rule ("MCR") 7.302(C)(3).[2] *See* Petition at 2; Corbin R. Davis Affidavit dated May 24, 1999. Petitioner promptly filed a motion for reconsideration with the Michigan Supreme Court, which was rejected.

■ Petitioner thereafter filed a petition for a writ of habeas corpus with the United States District Court, Eastern District of Michigan on April 1, 1999, raising the same issues he raised before the Michigan Court of Appeals.[3] The Respondent filed its response on October 1, 1999, after being granted extended time to respond. Both Petitioner's reply to the response and the government's notice of filing Rule 5 materials were filed on November 8, 1999. On September 6, 2000, the case was referred to the undersigned. Supplemental Rule 5 materials, including missing portions of the trial transcript, were filed on February 1, 2001, and February 26, 2001.

## II. *ANALYSIS*

### A. *Standard of Review Under the AEDPA*

■ Petitioner's application was filed after the effective date of the Antiterror-

---

**2.** MCR 7.302(C)(3) allows a defendant to file a delayed application for leave to appeal with the Supreme Court with an affidavit explaining the delay, but states that "a delayed application may not be filed more than 56 days after the Court of Appeals decision."

**3.** Petitioner's *pro se* petition incorporates by reference his brief on appeal, by counsel, before the Michigan Court of Appeals. Because

Petitioner is not represented by counsel in this habeas proceeding and has cobbled together a poorly drafted petition with a brief intended for the state court, this Court will hold the pleadings and other documents as a whole to less stringent standards. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

ism and Effective Death Penalty Act of 1996 ("AEDPA"), and therefore the provisions of the AEDPA apply. To be entitled to habeas relief, petitioner must show that his sentence was imposed in violation of the federal constitution or other federal law. As modified by the AEDPA, 28 U.S.C. § 2254(d) mandates that where a claim has been adjudicated on the merits in state court proceedings, habeas relief shall not be granted unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Supreme Court recently clarified how federal courts are to apply the separate provisions of § 2254(d)(1):

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor,* 529 U.S. 362, 412–413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., delivering opinion of the Court as to Part II). Under 28 U.S.C. § 2254(e)(1), a factual determination by a state court is presumed to be correct. Petitioner has the "burden of rebutting the presumption of correctness by clear and convincing evidence." *See also Warren v. Smith,* 161 F.3d 358, 361 (6th Cir.1998), *cert denied,* 527 U.S. 1040, 119 S.Ct. 2403, 144 L.Ed.2d 802 (1999).

Petitioner raises claims involving his right to federal due process and a fair trial, his due process right to a presumption of innocence, the right to compulsory process, and his due process right to a trial free from an identification tainted by impermissibly suggestive pre-trial identification procedures. He has not referred to any Supreme Court case that is factually indistinguishable from his own, and the undersigned is aware of none. Nor has petitioner asserted that the Michigan courts arrived at a conclusion of law in direct opposition to that of the Supreme Court. Accordingly, to be successful on his petition for writ of habeas corpus, Petitioner must show that the Michigan courts unreasonably applied clearly established Supreme Court precedent to these claims.

■ The AEDPA restricts this Court's scope of habeas review even when it believes the state decision is wrong and the petitioner's conviction is unconstitutional. "[A]n unreasonable application of federal law is different from an incorrect application of federal law." *Williams,* 120 S.Ct. at 1522. As the Supreme Court made clear in *Williams,* this is an objective standard: "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 1521. *See also Harris v. Stovall,* 212 F.3d 940 (6th Cir.2000) (applying the *Williams* standard and abrogating the "reasonable jurist" standard set forth in *Nevers v. Killinger,* 169 F.3d 352 (6th Cir.), *cert. denied,* 527 U.S. 1004, 119 S.Ct. 2340, 144 L.Ed.2d 237 (1999)).

In determining whether the state court decision was "contrary to," or an "unreasonable application of" federal law, the AEDPA specifically limits the source of law to "clearly established federal law, as determined by the Supreme Court." As explained by the Sixth Circuit,

> This provision marks a significant change from the previous language by referring only to law determined by the Supreme Court. A district court or court of appeals no longer can look to lower federal court decisions in deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. 17A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4261.1 (2d ed. Supp.1998).

*Herbert v. Billy,* 160 F.3d 1131, 1135 (6th Cir.1998).[4] The Supreme Court further narrowed the source of law to the "holdings, as opposed to the dicta" of the Court's decisions. *Williams,* 529 U.S. at 412, 120 S.Ct. 1495.

### B. *Procedural Default*

#### 1. *The State Court Decision*

Respondent contends that Petitioner's claims are barred by the doctrine of procedural default because Petitioner failed to timely appeal the Michigan Court of Appeals' October 2, 1998, decision.

A state prisoner's habeas corpus claims are procedurally defaulted if the prisoner has failed to comply with an independent and adequate state procedural rule, thus causing default of the prisoner's federal claims in state court. *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). This can occur when an individual fails to present an issue to a state appellate court upon the only opportunity to do so. *Teague v. Lane,* 489 U.S. 288, 297–98, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); *Rust v. Zent,* 17 F.3d 155, 160 (6th Cir.1994). In *Coleman,* the Supreme Court held that if the decision of the last state court to which a habeas petitioner presented his federal claims fairly appeared to rest primarily on federal law, or to be interwoven with federal law, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition. *Id.* at 735, 111 S.Ct. 2546. The Court went on to note:

> This rule does not apply if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred. In such a case there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims.

*Id.* at 735 n. 1, 111 S.Ct. 2546 (citation omitted). In *Harris v. Reed,* 489 U.S. 255,

---

4. This does not preclude all use of lower court decisions. While the sole source of the rule of law for habeas relief is now limited to law that has been clearly established by the Supreme Court, how that law is applied to various fact situations by the lower federal courts will still be relevant to determine what is an "objectively unreasonable application" of clearly established federal law. *See, e.g., Richardson v. Bowersox,* 188 F.3d 973 (8th Cir.1999) ("In determining whether a state court's decision involved an unreasonable application of clearly established federal law, it is appropriate to refer to decisions of the inferior federal courts in factually similar cases."), *cert. denied,* 529 U.S. 1113, 120 S.Ct. 1971, 146 L.Ed.2d 801 (2000). Thus, if a state appellate court application of a Supreme Court precedent is contrary to a sufficient number of federal circuit opinions with no split of authority in federal courts, that could be a strong indication that the state jurists have not acted with objective reasonableness.

270, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), Justice O'Connor noted that "dismissing such petitions for failure to exhaust state court remedies would often result in a game of judicial ping-pong between the state and federal courts, as the state prisoner returned to state court only to have the state procedural bar invoked against him." *Id.* at 270, 109 S.Ct. 1038 (concurring opinion). The record demonstrates that Petitioner did not timely seek review of his habeas claims on direct appeal to the Michigan Supreme Court. The Michigan Supreme Court rejected his delayed application for leave to appeal because Petitioner submitted the application beyond the 56–day time period for seeking such review under Michigan Court Rule 7.302(C)(3).[5] Thus, Petitioner has procedurally defaulted his habeas claims.

■ On habeas review, federal courts may review a procedurally barred claim only if the petitioner can either show cause and prejudice, or "demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546. The Supreme Court has analogized a "fundamental miscarriage of justice" to a showing of actual innocence. *See Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

### 2. *Cause*

Petitioner contends that he has shown sufficient cause to excuse his procedural default, stating:

while [Petitioner was at] E.C. Brooks Correctional Facility[,] that facility was "[l]ocked [d]own" due to the Michigan Department of Corrections[' i]mplementation of Property Policy based on Cain v. MDOC. Petitioner claim[s] that the prison law library was closed prior to, during, and shortly after the [n]ew [p]olicy [i]mplementation. Petitioner further claim[s] that during the latter part of the month of November, 1998, the [c]omputer [s]ystem was down, therefore, causing staff to cancel call-outs to [the] law library. Petitioner claim[s] that on November 25, 1998, he gave his application for leave to appeal to Resident Unit Manager [ ("RUM") ] Sandra Naves and a money disbursement to cover the cost of mailing.

Reply at 2. Attached to his petition, Petitioner provides a sworn affidavit by RUM Naves that verifies she was given the materials for mailing on or about November 25, 1998. Petitioner contends that he had no control over whether the application would be timely filed after giving it to RUM Naves. Notably, the government has not controverted any of these factual claims.

■ To establish cause a petitioner must ordinarily show that some factor external to the defense prevented his complying with the procedural requirement. *See Murray v. Carrier,* 477 U.S. 478, 488,

---

**5.** The Court of Appeals rendered its decision denying Petitioner's appeal on October 2, 1998. Under the time computation method prescribed in MCR 1.108, November 27, 1998, was the 56th day, but the rule also provides that "the last day of the period is included, unless it is a Saturday, Sunday, legal holiday, or holiday on which the court is closed pursuant to court order; in that event the period runs until the end of the next day that is not a Saturday, Sunday, legal holiday, or holiday on which the court is closed pursuant to the order." *Id.* Under MCR 8.110(D)(2), November 27, 1998, the Friday after Thanksgiving, was a holiday on which the court was closed. Thus, Petitioner had until Monday, November 30, 1998, to file his delayed application. His application was received by the court clerk on Tuesday, December 1, 1998. *See* December 7, 1998, letter from Corbin R. Davis, Clerk of the Michigan Supreme Court, attached to Petition.

106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).[6] It is also well established that a *pro se* petitioner is not excused from showing cause merely because of his pro se status or ignorance of his rights. *See Hannah v. Conley*, 49 F.3d 1193, 1197 (6th Cir.1995); *Weeks v. Bowersox*, 119 F.3d 1342, 1344, n. 7 (8th Cir.1997) (en banc); *Barksdale v. Lane*, 957 F.2d 379, 385–386 and n. 15 (7th Cir.), *cert. denied*, 506 U.S. 890, 113 S.Ct. 257, 121 L.Ed.2d 189 (1992).

▮ If indeed a "lock-down" occurred or a computer system malfunction impeded Petitioner's access to the law library for a significant period of time, then this might constitute an external factor that prevented Petitioner from meeting a relatively short (56–day) deadline. Yet, in this case it is not likely that Petitioner's impeded access to the library delayed his ability to file the application because Petitioner did not do any new legal analysis for this filing. Instead he incorporated by reference the claims contained in his brief on appeal. *See* Form Pet. at Question 9(e)(4). While this could be explained by the fact that Petitioner never did obtain sufficient access in the library to supplement, change, or add to this brief, this is unlikely given that Petitioner incorporates by reference his same appellate brief in the present petition. Because Petitioner has not demonstrated any additional legal research on his claims by the time he filed this petition on April 1, 1999, it cannot be found that his lack of access to the library impaired or delayed the filing of his application with the Michigan Supreme Court.[7]

▮ Petitioner also contends that he substantially complied with the deadline when he relinquished control over his application by entrusting it to prison authorities for mailing before the 56–day deadline. After that, Petitioner contends, he could do nothing more to assure that his application would be timely filed. Pet. at 2. Petitioner relies on the Supreme Court's opinion in *Houston v. Lack*, 487 U.S. 266, 272, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988) in which the Court considered whether a *pro se* habeas petitioner's notice of appeal was effectively "filed" in the district court within the 30–day period provided for by Fed. R.App. P. 4(a)(1). Pet. at 2. The petitioner in *Lack* had delivered his notice of appeal to prison officials for mailing three days before the deadline. *Id.* at 269, 108 S.Ct. 2379. The notice of appeal was stamped filed in the district court on the thirty-first day, one day late. *Id.* In reversing the order of the Sixth Circuit dismissing the appeal as jurisdictionally out of time, the Supreme Court explained:

> Unlike other litigants, *pro se* prisoners cannot personally travel to the courthouse to see that the notice is stamped "filed" or to establish the date on which the court received the notice. Other litigants may choose to entrust their appeals to the vagaries of the mail and the clerk's process for stamping incoming papers, but only the *pro se* prisoner is forced to do so by his situation. And if other litigants do choose to use the mail, they can at least place the notice direct-

**6.** Examples of "external factors" include attorney conflict of interest, *see Jamison v. Lockhart*, 975 F.2d 1377, 1380 (8th Cir.1992), incarceration and access to other state's appellate rules, *see Dulin v. Cook*, 957 F.2d 758, 760 (10th Cir.1992), unavailability of witness at time of trial, *see Cornell v. Nix*, 953 F.2d 1103, 1105 (8th Cir.), *cert. denied*, 507 U.S. 1020, 113 S.Ct. 1820, 123 L.Ed.2d 450

(1993), and failure to inform a defendant of his right to appeal, *see Hardiman v. Reynolds*, 971 F.2d 500, 506 (10th Cir.1992).

**7.** Petitioner does not contend that his lack of library access impaired his ability to obtain the clerical materials (e.g.paper, pens, envelopes) he needed to file his application with the Michigan Supreme Court.

ly into the hands of the United States Postal Service (or a private express carrier) and they can follow its progress by calling the court to determine whether the notice has been received and stamped, knowing that if the mail goes awry they can personally deliver notice at the last moment or that their monitoring will provide them with evidence to demonstrate either excusable neglect or that the notice was not stamped on the date the court received it. Pro se prisoners cannot take any of these precautions; nor, by definition, do they have lawyers who can take these precautions for them. Worse, the pro se prisoner has no choice but to entrust the forwarding of his notice of appeal to prison authorities whom he cannot control or supervise ... No matter how far in advance the pro se prisoner delivers his notice to the prison authorities he can never be sure that it will ultimately get stamped "filed" on time.

*Id.* at 271, 108 S.Ct. 2379. The Court went on to hold that the notice of appeal was filed at the time petitioner delivered it to the prison authorities for forwarding to the court clerk. *Id.* at 276, 108 S.Ct. 2379. While the decision was supported only by a narrow five-justice majority, Justice Scalia, joined by the three other dissenting justices, agreed that "the Court's rule makes a good deal of sense." *Id.* at 277, 108 S.Ct. 2379. Justice Scalia and the other dissenting justices "dissent[ed] only because it [was] not the rule ... promulgated through congressionally prescribed procedures." *Id.*

The wisdom of the majority's rule in *Lack* was later affirmed by the Supreme Court and Congress when Fed. R.App. P. 4(c) was amended in 1993. The amended rule provides in pertinent part:

If an inmate in an institution files a notice of appeal in either a civil or crimi-

nal case, the notice is timely if it is deposited in the institution's internal mailing system on or before the last day of filing.

Fed. R.App. P. 4(c)(1). In promulgating the rule the Advisory Committee specifically noted that the amendment reflects the *Lack* decision. *See* Advisory Committee Note to Fed. R.App. P 4(c): 1993 Amendment. In effect, this rule signifies that being powerless to insure a timely filing of notice of appeal in the federal courts—after entrusting the filing to prison officials and to the mail on or before the last day for filing—is *always* sufficient cause to excuse *pro se* litigants whose filings would otherwise be untimely.

Federal courts, including the Sixth Circuit, have not hesitated to apply the *Lack* "mailbox rule" to various other kinds of prisoner filings. *See, e.g., McGore v. Wrigglesworth,* 114 F.3d 601, 605 (6th Cir. 1997) (rule applies to a motion for an extension of time to correct filing deficiency regarding *in forma pauperis* status); *In re Sims,* 111 F.3d 45, 47 (6th Cir.1997) ("for purposes of the one-year limitation periods established by 28 U.S.C. § 2244(d)," a § 2244(b)(3) motion is deemed filed on the date that the motion is given to prison authorities for mailing); *Gilbert v. Joyce,* 129 F.3d 1263, No. 97–3140, 1997 WL 693564 (6th Cir. Oct. 31, 1997) (table) (applying rule to prisoner 42 U.S.C. § 1983 complaints); *Walker v. City of Lakewood,* 35 F.3d 567, 1994 WL 462137, No. 93–4239 (6th Cir. Aug. 25, 1997) (table) (applying the rule to objections to magistrate judge's report and recommendation). At least one circuit has suggested that the rule applies to all prisoner filings in the federal courts. *Faile v. Upjohn,* 988 F.2d 985, 989 (9th Cir.1993) ("[w]hen a *pro se* prisoner alleges that he timely complied with a procedural deadline by submitting a document to prison au-

thorities, the district court must either accept the allegation as correct or make a factual finding to the contrary ..." because there is no reason to distinguish between notice of appeals under *Lack* and other prisoner filings). *See also Erwin v. Elo,* 130 F.Supp.2d 887, 888 (E.D.Mich. 2001) (habeas petition is deemed filed for purpose of statute of limitations on the date petition submitted to prison authorities).

In this case, the Court obviously has no authority to announce a similar rule for the timely filing of appeals by prisoners in the Michigan courts. Further, it is clear that *pro se* litigants are subject to the same cause requirement as those represented by counsel. *Hannah,* 49 F.3d at 1197. Nevertheless, that this is a *pro se* petition does not create a presumption against a finding of cause. Rather, this merely means that Petitioner must, like any other petitioner represented by counsel, demonstrate cause to excuse his procedural default. Given the combination of 1) the Supreme Court's unanimous endorsement of the good sense of the rule set forth in *Lack,* 2) the affirmation of the wisdom of that rule by the subsequent amendment to Fed. R.App. P. 4(c), and 3) the Sixth Circuit's and other circuits' frequent application of the *Lack* rule to other prisoner filing situations, there is ample reason to conclude that federal courts should construe the difficulties faced by *pro se* litigants as factors external to the defense preventing compliance with procedural requirements. *Carrier,* 477 U.S. at 488, 106 S.Ct. 2639. In other words, the difficulties with court filings faced by *pro se* petitioners—including having no choice but to rely on both prison officials and the "vagaries of the mail" without any ability

to remedy or monitor any missteps along the way—should suffice as adequate "cause" to excuse a state procedural default in at least certain situations.

In this case, as discussed in note four above, Petitioner's application for leave to appeal in the Michigan Supreme Court was file stamped only one day late. Petitioner asserts that he entrusted the application to RUM Naves for mailing before the 56-day deadline, and provides a sworn affidavit by RUM Naves to support this assertion. Further, the government has not controverted this assertion. Therefore, Petitioner's having no choice but to wholly relinquish control over his application to prison authorities and to the mail, without having any ability to subsequently remedy any delays, should be construed as adequate cause to excuse his procedural default in filing his application for leave to appeal only one day late. Petitioner, however, must also show prejudice before he is entitled to a review of his claims on the merits.

### 3. *Prejudice*

█ In order to show prejudice, Petitioner must show "not merely that [any] errors at ... trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady,* 456 U.S. 152, 168, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) (emphasis in original). A more recent Supreme Court decision described the prejudice question in the context of a *Brady* [8] violation as whether the " 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Strickler v.*

---

**8.** *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (withholding of exculpatory evidence by the prosecution from

the defense violated defendant's right to due process).

*Greene,* 527 U.S. 263, 290, 119 S.Ct. 1936, 1952, 144 L.Ed.2d 286 (1999) (quoting *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). As should be readily apparent, this standard is more difficult for the movant to meet than is the plain error standard of Fed. R.Crim.P. 52(b), which is used on direct appeal. *Napier v. United States,* 159 F.3d 956, 962 (6th Cir.1998).

The Sixth Circuit has recently described how district courts should approach the prejudice inquiry:

> (1) "the prejudice that must be shown must be a result of the alleged constitutional violation and not a result of the trial counsel's failure to meet state procedural guidelines;" (2) "the burden is on the petitioner to show that he was [actually] prejudiced by the alleged constitutional error ..., not merely a possibility of prejudice;" and (3) "in analyzing a petitioner's contention of prejudice, the court should assume that the petitioner has stated a meritorious constitutional claim." [*Maupin v. Smith,* 785 F.2d 135, 139 (6th Cir.1986) (citations omitted) ]. Of course, if the district court finds that the petitioner has established prejudice, it should proceed to decide the merits of his constitutional claims.

*White v. Schotten,* 201 F.3d 743, 753–754 (6th Cir.2000). Thus, in analyzing prejudice in this case constitutional error should be assumed for each of the three claims asserted. For each of the alleged constitutional errors, Petitioner must show actual prejudice before an analysis of the merits may be undertaken.

### a. *In-court identification of petitioner by witness*

 Petitioner claims that his conviction was unconstitutional because it was based on a tainted in-court identification of him by Ms. Laster as her assailant. Ms. Laster's testimony identifying Petitioner as her assailant was the primary and most persuasive evidence against Petitioner at his trial. This testimony effectively foreclosed the possibility of Petitioner succeeding on his defense theory that his confession was coerced. It also foreclosed any possibility of a credible explanation, consistent with Petitioner's innocence on these charges, for why Petitioner had the phone card belonging to Ms. Laster's boyfriend in his possession. While the prosecution might still have obtained a conviction without the identification testimony, it is evident that the testimony was a substantial contributing factor to Petitioner's conviction. Because it is clear that Ms. Laster's testimony identifying Petitioner worked to his *actual* and *substantial* disadvantage, Petitioner is entitled to a review of this claim on the merits.

### b. *Compulsory Process*

 Petitioner claims that the trial court infringed upon his right to compulsory process when it excluded evidence that he had suffered assaults at the hands of police officers on previous occasions before his confession to the police. Petitioner's theory at trial was that Detective Fulton coerced a false confession from him, and was able to do so because he feared for his safety due to several previous assaults by the police. Br. in Supp. at 12.

The prosecution objected when defense counsel attempted to elicit this testimony. The trial court ruled that the testimony was inadmissible:

> The Court is going to state its ruling on the record. I did indicate this preliminarily to counsel when you had approached the bench. The Court is ruling under the Evidence Rule 403 that there may be evidence that although relevant, it may be excluded if its proba-

tive value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or other considerations.

Now what the Court also focused on and indicated to counsel is that the Court would allow the more narrow question as to whether or not there had been any negative response or experience that the defendant had of this particular officer, Detective Fulton.

But as far as the general question of had he ever had any negative responses or experiences—responses from or experiences with other police officers, the Court feels that the probative value would be substantially outweighed by the danger of unfair prejudice.

Trial Transcript V at 72–73. In affirming Petitioner's conviction, the Michigan Court of Appeals stated in part, "defendant was allowed to testify that he was terrified when he gave his statement to the detective and that his fear stemmed from the fact that no one could see into the interview room should the detective strike him. Defense counsel was also allowed to explore any negative experiences between defendant and the detective." *Robertson*, No. 202986, * 2.

 The Compulsory Process Clause of the Sixth Amendment grants a criminal defendant the right to call witnesses that are "material and favorable to his defense." *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). However, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308–309, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (holding that a Military Rule of Evidence, which makes polygraph evidence inadmissible in court-martial proceedings, does not unconstitutionally abridge the right of

the accused to present a defense). Indeed, as the Supreme Court has explained: "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *see also Scheffer*, 523 U.S. at 308–309, 118 S.Ct. 1261 (reaffirming that "state and federal lawmakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials").

In order for this claim to be addressed on the merits, Petitioner must demonstrate that the presentation of the excluded testimony " 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Strickler*, 119 S.Ct. at 1952. Petitioner has not met this stringent burden.

First, the ruling did not completely foreclose Petitioner's opportunity to contend that his confession was coerced. As noted by the Court of Appeals, Petitioner was allowed to testify about his negative experiences with Detective Fulton, the detective who elicited the confession. He was also permitted to testify that he was terrified when he gave the confession because no one could see into the interview room if Detective Fulton were to brutalize him. Trial Transcript V at 67–77. Second, the exclusion of this testimony does not undermine the confidence in the verdict because this was not the type of case where Petitioner's argument—that a false confession was coerced—was likely to succeed. As discussed above, Ms. Laster identified Petitioner as being her assailant after spending almost one hour with him. The calling card that was in her purse belonging to her boyfriend was found by the police on

Petitioner. Petitioner's facile explanation was that he did not recall whether he had ever had the card in his possession. *Id.* at 80. Finally, Petitioner's credibility was significantly undermined when, on cross-examination, the prosecution elicited that he had been convicted of perjury four years earlier. *Id.* at 96. Because there was ample evidence on which to convict Petitioner as well as ample reason to disbelieve Petitioner's assertion that he gave a false confession, it cannot be concluded that the exclusion of the evidence "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady,* 456 U.S. at 168, 102 S.Ct. 1584 (emphasis in original). Neither has Petitioner demonstrated that the presentation of the excluded testimony " 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Strickler,* 119 S.Ct. at 1952. Accordingly, Petitioner has failed to demonstrate sufficient prejudice to excuse the procedural default.

c. *Prosecutorial Misconduct: Shifting the Burden of Proof*

 Petitioner contends he was denied a fair trial because the prosecution shifted the burden of proof by soliciting testimony on Petitioner's alibi notice during its case in chief. The testimony at issue was solicited when Detective Connie Koski, the officer in charge of this case, was on the witness stand:

Q: After the arrest of the defendant and the interview, did there come a time that you ended up interviewing additional witnesses?

A: Yes.

Q: And when was that?

A: After the last hearing of this case.

Q: And what happened on August 19th that caused you to interview additional people?

A: The defense offered an alibi and advised that they were going to be using that in their case and so I went to interview the alibi witness.

Q: So they offered different alibi witnesses [ ] from what the defendant had told you earlier were his alibi witnesses?

A: One of the people were the same. And one of them wasn't.

Q: Could you tell us who they were that he talked about that he was going to [c]all [sic]?

A: Martin McClellan, Willie Irene Davis, and Larry Shymanksi.

Trial Transcript IV at 53. Petitioner asserts that after this testimony he testified on his own behalf, but did not present any alibi witnesses. Br. in Supp. at 6. Yet, Petitioner did present an alibi defense, claiming that he was with Michael Sullivan and Raymond Akins before 1:00 a.m.—the time of the assault on Ms. Laster—and with Ms. Christine Macksegian around 1:00 a.m. Trial Transcript V at 87–92.

 The Due Process Clause protects criminal defendants against conviction except on the prosecution's "proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Yet, to prevail on a claim of prosecutorial misconduct, the alleged misconduct must so infect the trial with unfairness as to make the resulting conviction a denial of due process. *Donnelly v. DeChristoforo,* 416 U.S. 637, 645, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

The testimony solicited on Petitioner's alibi notice had absolutely no relevance to the prosecution's prima facie case. This

testimony only became relevant as impeachment evidence after Petitioner gave his alibi testimony because he mentioned different alibis at trial than those given in his notice. It was therefore improper for the prosecution to solicit this testimony during the prosecution's case in chief, and the testimony had potential to shift the burden of proof to the Petitioner. While the solicitation of this testimony is troubling, it cannot be concluded that the testimony "worked to [Petitioner's] *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 168, 102 S.Ct. 1584. Petitioner neither alleges that he would have employed a different defense strategy had the prosecution not elicited the testimony on his alibi defense nor that he would not have given his alibi testimony. Thus, the testimony at issue could have been properly solicited as impeachment evidence after Petitioner testified. The conclusion that the effect that the challenged testimony had on Petitioner's defense strategy was minimal is also buttressed by the fact that defense counsel did not even object to the later challenged testimony.[9] Finally, any possible shifting of the burden of proof to petitioner does not rise to the level of prejudice necessary to excuse Petitioner's procedural default because any possible prejudice was cured by the trial court's instructions regarding the burden of proof. Trial Transcript V at 204–205. *See Russ v. Stegall*, 2000 WL 791753, *4 (E.D.Mich.) (citing *Lugo v. Kuhlmann*, 68 F.Supp.2d 347, 369 (S.D.N.Y.1999)); *Rich v. Curtis*, 2000 WL 1772628, * 8 (E.D.Mich.2000). For these reasons, Petitioner has failed to demonstrate sufficient prejudice to excuse his procedural default.

### 4. *Fundamental Miscarriage of Justice*

Although Petitioner has not demonstrated sufficient prejudice to excuse his procedural default for the latter two claims, a full review of the merits of his petition would be proper if he were able to "demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750, 111 S.Ct. 2546. The Supreme Court has analogized a "fundamental miscarriage of justice" to a showing of actual innocence. *See Carrier*, 477 U.S. at 496, 106 S.Ct. 2639. Because Petitioner does not attempt to demonstrate a fundamental miscarriage of justice and none is apparent on the current record, further review of these claims is foreclosed.

### C. *Merits of Petitioner's Unconstitutional Identification Testimony Claim*

As noted above, Petitioner claims that his conviction was unconstitutional because it was based on a tainted in-court identification of him by Ms. Laster as her assailant. A conviction based on identification testimony following pretrial identification violates the defendant's constitutional right to due process whenever the pretrial identification encounter is so "impermissibly suggestive as to give rise to a very substantial likelihood of irrepara-

---

**9.** The government correctly points out that defense counsel's failure to object raises an additional procedural default problem. Petitioner asserts that any procedural default should be excused by the ineffectiveness of trial counsel. Br. in Supp. at 10. Because this report does not find that Petitioner has demonstrated sufficient prejudice to excuse his procedural default, it is not necessary to analyze this procedural default within a procedural default problem. Such an inquiry would be superfluous given the recommendation in this report, and substantial work would be required to analyze and explain whether the Michigan Court of Appeals relied on a procedural default rule and whether trial counsel was constitutionally ineffective thus excusing the default.

ble misidentification." Because "reliability is the linchpin" of this analysis, courts have used two steps to find the use of identification testimony unconstitutional. First, the court evaluates the undue suggestiveness of the preidentification encounters. If the encounters were unduly suggestive, the trial court evaluates "the totality of the circumstances" to determine whether there are nevertheless sufficient independent indicia of reliability. *Thigpen v. Cory,* 804 F.2d 893, 895 (6th Cir.1986). It is the effect of any identification encounters rather than their cause that determines their suggestiveness. Therefore, whether the police or prosecution caused the encounters intentionally or inadvertently is irrelevant as to their suggestiveness.

■■■■ The factors to be considered when deciding whether the identification was reliable despite the unduly suggestive preidentification encounters include (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id.* at 896 (citing *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972)). Although a federal habeas court must afford a presumption of correctness to the state court's factual findings concerning these factors, whether the factors demonstrate reliability in the identification process is a question of law for the federal court to decide. *Id.* (citing *Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982) (per curiam)).

In affirming Petitioner's conviction, the Michigan Court of Appeals rejected this claim of error, stating:

> After reviewing the evidence presented at the *Wade* hearing in light of the factors set forth by our Supreme Court in *People v. Kachar,* 400 Mich. 78, 95–96, 252 N.W.2d 807 (1977), we conclude that the trial court did not clearly err in determining that there was an independent basis to support the victim's in-court identification of defendant. It is clear that some of the factors examined weigh against finding an independent basis for the in-court identification, such as the fact that the victim had no prior relationship with defendant, the victim failed to identify defendant conclusively in two photographic lineups, and the victim had consumed twelve beers in the 4–1/2 hours before the attack. However, several other factors supported the finding of an independent basis. The victim had almost one hour to observe defendant and she was in face-to-face contact with him and was able to focus on his eyes during the attack. On two occasions, defendant walked down a lighted street with the victim. The length of time between the attack and the challenged identification was less than two months. The victim did not identify anyone else as her attacker. Her descriptions of her attacker after the assault were consistent and included a distinguishing feature—a missing right front tooth. Defendants is missing that tooth. Finally, the victim testified that, although she had been drinking before the attack, she did not have trouble thinking clearly. Nothing in the record disputes that testimony. On balance, it cannot be said that the court clearly erred in concluding that there was an independent basis upon which the victim's in-court identification of defendant could be based.

*Robertson,* No. 96–005687, * 2. Implicit in this analysis of whether there was a sufficient independent source for Ms. Laster's identification of Petitioner is a finding that there was a suggestive pretrial identification encounter. Petitioner asserts that

Ms. Laster was in the courtroom at the preliminary examination during which Petitioner was brought in wearing chains and jail clothing, was seated at the defense table, and during which several witnesses testified against Petitioner. Br. in Supp. at 21. The government neither contends that this did not happen nor that this was not impermissibly suggestive. Thus, the only issue for this Court is whether the Michigan Court of Appeals decision that there was an independent source constitutes an unreasonable application of clearly established federal law.

■ In its discussion of this issue, the Michigan Court of Appeals cited *People v. Kachar*, 400 Mich. 78, 95–96, 252 N.W.2d 807 (1977). In that case, the Michigan Supreme Court, relying on *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), developed a list of factors to be considered in determining whether there is an independent source for identification: (1) any prior relationship or knowledge of the defendant; (2) the opportunity to observe the offense; (3) the length of time between the offense and the identification; (4) the accuracy or discrepancies in the descriptions provided by the witness; (5) any previous proper identifications or failure to identify the defendant; (6) any identification prior to the lineup or showup of another person as the defendant; (7) the nature of the alleged offense and the physical and psychological state of the victim; and (8) any special features of the defendant. These factors are similar to the factors set forth by the Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), and explicitly incorporate three of the five factors listed in *Biggers*: 1) opportunity to

observe the assailant; 2) accuracy of prior identifications; and 3) the length of time between the crime and the confrontation. The totality of the remaining *Kachar* factors serve as a reasonable proxy for the two *Biggers* factors not explicitly incorporated by the *Kachar* court: 1) degree of attention and 2) the level of certainty demonstrated by the witness at the confrontation.

Petitioner contends that 1) there was no prior relationship between him and Ms. Laster; 2) there were two failures by Ms. Laster to identify Petitioner's photograph during separate photo arrays; 3) Ms. Laster's perception at the time of the event was compromised by the beer she consumed and by her emotion and fear during the assault; 4) Petitioner is not missing a front tooth, but instead has a chipped front tooth; and 5) Ms. Laster testified that she could not really see Petitioner's face and was impeached with prior inconsistent statements regarding her identification of Petitioner.[10] Br. in Supp. at 24–25; Reply Br. at 16.

■ Petitioner does not contend that the Michigan Court of Appeals failed to consider the correct factors in their analysis of whether there was an independent source for the identification. Instead, Petitioner challenges the court's analysis and application of the factors to the facts in this case. Petitioner's challenges to Ms. Laster's ability to perceive and observe essentially challenge the weight to be accorded her testimony. Yet, it is well settled that "[a] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact

---

10. The citation Petitioner provides in support of this contention is from the trial transcript, and this testimony, elicited on cross-examination, occurred only after Ms. Laster had already been permitted to identify Petitioner.

The issue of whether she should have been permitted to identify Petitioner in-court, however, was decided before the trial based on the testimony adduced at the *Wade* hearing.

resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Walker v. Engle*, 703 F.2d 959, 969–970 (6th Cir.1983). The trial judge on this record could accept Ms. Laster's testimony that she observed Petitioner's face, walked down a lighted street with him, and had an opportunity to observe his eyes. *Wade* Transcript at 15–16. In terms of the *Biggers* analysis, these facts also weigh towards a finding that Ms. Laster viewed Petitioner in the initial encounter with a high degree of attention.

The Michigan Court of Appeals acknowledged that there was no prior relationship between Petitioner and Ms. Laster and that Ms. Laster had not identified Petitioner's photograph from the two photograph arrays.[11] Yet, the court also listed the several factors weighing towards a finding of an independent source: the one hour Ms. Laster had to observe her assailant, the face-to-face contact, Ms. Laster's focus on his eyes, their walking together down a lighted street, the length of time between the encounter and the challenged identification being short—two months, the fact that Ms. Laster identified no one else as her assailant,[12] and her consistent descriptions, including the description of the missing tooth. Petitioner's contention that his tooth is chipped rather than missing may lessen the impact of this distinguishing characteristic in Ms. Laster's description, but does not diminish the value of the distinguishing characteristic altogether.

The difference in appearance between a chipped tooth and a missing tooth can be minimal, and Petitioner does not contend that his tooth is only slightly—or even less than half—chipped.[13]

While this case may present a close question on whether there was an independent source for Ms. Laster's in-court identification of Petitioner, it is not the role of this Court to decide the issue *de novo*. Thus, even if this Court were to agree that there was not a sufficient independent basis for the in-court identification, habeas relief would not be warranted unless the Michigan Court of Appeals' resolution of this issue constituted an unreasonable application of clearly established federal law. It did not. *See, e.g., United States v. Hill*, 967 F.2d 226, 232–33 (6th Cir.1992) (in-court identification of alleged bank robber held admissible despite five years between incident and trial and slight inaccuracies in witness' description of robber, where witness' view of robber was brightly lit and unobstructed and she showed high degree of certainty in in-court identification); *Johnson v. Sublett*, 63 F.3d 926, 928–29 (9th Cir.1995), *cert. denied*, 516 U.S. 1017, 116 S.Ct. 582, 133 L.Ed.2d 504 (1995) (witness' in-court identification of habeas petitioner during state trial was not a violation of due process despite witness' failure to identify petitioner in photo spread and petitioner's presence at pretrial suppression hearing). Rather, the Michigan Court of Appeals applied a balancing test based on

11. While neither of these factors are part of the analysis set forth in *Biggers*, 409 U.S. at 199, 93 S.Ct. 375, as noted above, the additional factors in *Kachar* serve as a reasonable proxy for those *Biggers* factors not required by the *Kachar* analysis.

12. Petitioner contends that this finding is erroneous because Ms. Laster stated that two different men in the two photograph arrays looked liked her assailant. Reply at 15–16. After a review of the investigative reports included as Exhibits A and B with Petitioner's

reply, it is evident that Ms. Laster did not identify anyone as her assailant, but merely answered questions about which men looked the "most" like her assailant. It is clear that her statements were not meant as identifications of any other assailant.

13. Because this issue is not critical to a decision on this habeas claim, it is not necessary for this Court to conduct any sort of fact finding on exactly how much of Petitioner's tooth is missing.

state law, *Kachar*, substantially similar to the test prescribed by the United States Supreme Court in *Biggers*. The court's finding that the totality of the factors weighing towards a finding of independent source outweighed the few factors weighing against a finding of an independent source was not unreasonable. Because the Michigan Court of Appeals' decision does not constitute an unreasonable application of clearly established federal law, Petitioner is not entitled to habeas relief on this claim.

Finally, in addition to considering the reliability of the actual identification, courts look to other evidence of guilt to determine whether, if the identification was tainted, permitting the identification was error of sufficient magnitude to rise to a constitutional level, i.e., to a very substantial likelihood of irreparable misidentification, *United States v. Aigbevbolle*, 772 F.2d 652, 653 (10th Cir.1985), or the error was harmless, *United States v. Archibald*, 734 F.2d 938, 942–43, *modified*, 756 F.2d 223 (2d Cir.1984). In this case, Petitioner's confession linked him to the crime. Further, a calling card belonging to Ms. Laster's boyfriend that was in her purse at the time of her assault was found in the Petitioner's possession by the police. As noted above, Petitioner's facile explanation of the calling card was that he did not recall whether he ever had the calling card in his possession. Trial Transcript V at 80. Given Petitioner's strong link to the Ms. Laster's assault, the possibility of misidentification was extremely low. Thus, this claim for habeas relief should fail.

## III. *RECOMMENDATION*

For the reasons stated herein, IT IS RECOMMENDED that Petitioner Terry Robertson's application for habeas relief be DENIED.

Any objections to this Report and Recommendation must be filed within ten (10) days of its service. 28 U.S.C. § 636(b)(1); E.D. Mich. LR 72.1(d)(2). Failure to file objections within the specified time constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Ivey v. Wilson*, 832 F.2d 950, 957–58 (6th Cir. 1987); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections. February 27, 2001.